hPLOTKIN, Judge.
This writ presents a res nova issue. We must decide how to determine a foreign corporation’s primary place of business under La. C.C.P. art. 42(4). For the following reasons, we reverse the trial court judgment and hold that J. Ray McDer-mott, Inc.’s primary place of business is in Assumption Parish.
Plaintiff, Kentrell Dorsey was injured on a lay barge on August 24, 1997. At the time, he was employed by J. Ray McDer-mott, Inc. Plaintiff filed suit in the Civil District Court for the Parish of Orleans against J. Ray McDermott, Inc. alleging damages under the Jones Act and the general maritime law.
The trial court originally granted J. Ray McDermott, Inc.’s declinatory exception of improper venue, finding that venue was proper in Assumption Parish. However, after further discovery, plaintiff sought rehearing and the trial court reversed itself and found that Orleans Parish was the proper venue for this action. Defendant now seeks review of that ruling.
The only issue presented by this writ is whether the trial court erred when it found that, under La. C.C. art. 42(4), the primary place of business of J. Ray McDermott, Inc. is Orleans Parish.
La. C.C.P. art. 42(4) reads:
LA foreign corporation licensed to do business in this state shall be brought in the parish where its primary place of business in the state is located or in the parish designated as its principal business establishment in its application to do business in the state.
J. Ray McDermott, Inc. is a foreign corporation licensed to do business in Louisiana; its designated principal business establishment is in Amelia, Louisiana.
As previously noted, this issue is res nova; no other state or federal court in Louisiana has clearly defined what constitutes a foreign corporation’s primary place of business. This Circuit, in Hyatt v. Petrolite Corp., 95-0767 (La.App. 4 Cir. 1/19/96), 668 So.2d 432, 434 discussed the legislative intent behind the 1990 amendments to La. C.C.P. art. 42(4). That court stated:
However, the case law suggests that “primary place of business” and “principal business establishment” have different meanings and are not mutually exclusive.
In light of the legislative history, the Hyatt court was clearly correct. See also, Keener v. General Motors Corp., 993 F.2d 70 (5th Cir.1993). The purpose of the amendment was to provide, “that venue as to a foreign corporation is proper either where its primary place of business in the state is located or in the parish designated as its principal place of business in its application to do business in the state.” Digest, H.B. No. 507, Regular Session, 1990. Moreover, the phrase, “where its primary place of business in the state is located,” indicates that this court must carefully determine, where the corporation *998 primarily conducts its business in Louisiana in fact; we must determine where the actual corporate purpose is fulfilled.
An examination of federal law is helpful. For a corporation to be a party in a federal court under diversity jurisdiction, it is necessary to establish the citizenship [3of the corporation to determine if the federal court has subject matter jurisdiction. The specific language is found in 28 U.S.C.A. § 1332(c)(1):
a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business.
Although the federal statute uses the word “principal”, the definition of “primary” is virtually identical. Primary is defined as, “first in importance; chief; principal; main.” Principal is defined as, “first in rank, authority, importance, degree, etc.” WEBSTER’S NEW WORLD COLLEGE DICTIONARY, 1069, 1070 (3d ed.1996). Therefore, while determining the principal place of business under federal law is necessary to determine diversity jurisdiction, the same legal reasoning for determining federal diversity shall be used for detennining Louisiana venue for foreign corporations.
The federal jurisprudence has developed two separate, but overlapping tests to determine which state is a corporation’s principal place of business: the “nerve center” test and the “place of activities” test. Many courts have now started to combine these tests and have created the “total activities” test.
The “nerve center” test was coined in Scot Typewriter Co. v. Underwood Corp., 170 F.Supp. 862 (S.D.N.Y.1959). The often-quoted legal precept that created the “nerve center” test is as follows:
Where a corporation is engaged in far-flung and varied activities which are carried on in different states, its principal place of business is the nerve center from which it radiates out to its constituent parts and from which its officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objective. The test applied by our Court of Appeals, is that place where the corporation has an “office from which its business was directed and controlled” - the place where “all of its business was under the supreme direction and control of its officers.”
14Id. at 865. Thus, the “nerve center” analysis originally found corporate citizenship to be in the state where business decisions were made. However, its application has been narrowed in recent years and it is now applied in cases that involve very large corporations with operations that span several states. “The “nerve center” test should be used only when no state contains a substantial predominance of the corporation’s business activities.” Danjaq, S.A. v. Pathe Communications Corp., 979 F.2d 772, 776 (9th Cir.1992).
The “place of activity” test was developed in Kelly v. U.S. Steel Corp., 284 F.2d 850 (3rd Cir.1960). The Third Circuit was faced with a situation where U.S. Steel had all of its executive offices in New York, but its operations were in several different states, Pennsylvania having the most production capabilities and employees. The court rejected the “nerve center” analysis and stated,
All this points to us the conclusion that business by way of activities is centered in Pennsylvania and we think it is the activities rather than the occasional meeting of policy-making Directors which indicate the principal place of business.
Id. at 854.
Finally, the Fifth Circuit adopted the “total activity” test in Anniston Soil Pipe Co. v. Central Foundry Co., 329 F.2d 313 (5th Cir.1964), but the court did not enunciate any rules. It merely stated in a per curiam that it adopted the reasons of the lower court. It was not until 1987, in J.A. Olson Co. v. City of Winona, Miss., 818 F.2d 401 (5th Cir.1987), that the Fifth Circuit elucidated the “total activity” test clearly and wrote extensively on how to *999 make the analysis. It summarized the existing rules as follows:
Thus, neither the “nerve center” nor the “place of activity” test inflexibly dictates the corporation’s ^principal place of business. Rather, the tests simply stand for general rules regarding the determination of a particular corporation’s principal place of business: the principal place of business of a far-flung corporation will generally be its nerve center; the principal place of business of a corporation with significant administrative authority and activity in one state and lesser executive offices but principal operations in another state is generally the district of the former; and the principal place of business of a corporation with its corporate headquarters in one state and its single activity in another will generally be in the state of its operations.
Id. at 409. Thus, basically, the courts simply look to all of the relevant factors and decide where the “heart” of the corporation really is, with special emphasis on whether the activity is labor-intensive or managerial; passive or active; close-knit geographically or far-flung. (For analysis of various factors, See Harris v. Black Clawson Co., 961 F.2d 547 (5th Cir.1992); Grinter v. Petroleum Operation Support Service, 846 F.2d 1006 (5th Cir.1988), cert denied, Petroleum Operation Support Service v. Grinter, 488 U.S. 969, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988); J.A.Olson Co. v. City of Winona, Miss., 818 F.2d 401 (5th Cir.1987); Village Fair Shopping Center Co. v. Sam Broadhead Trust, 588 F.2d 431 (5th Cir.1979); Frontier Energy Corp. v. Broda, 882 F.Supp. 82 (N.D.W.Va.1995); Grimm v. Plasma Processing Corp., 888 F.Supp. 56 (S.D.W.Va.1995); Hanna v. Fleetguard, Inc., 900 F.Supp. 1110 (N.D.Iowa 1995); Tubbs v. Southwestern Bell Telephone Co., 846 F.Supp. 551 (S.D.Tex.1994); High Ridge Park Associates v. Nycom Information Services, Inc., 821 F.Supp. 835 (D.Conn.1993); Anniston Soil Pipe Co. v. Central Foundry Co., 216 F.Supp. 473 (N.D.Ala.1963)).
[fiThe following general rules can be utilized to assist in determining venue; however, this is a fact-intensive evaluation and no two cases will be identical [1]:
(1) If the foreign corporation has only one labor-intensive facility located in one parish, but its “nerve center” is in another parish, than the former is the primary place of business.
(2) If the corporate purpose is passive and management intensive, (i.e. a real estate investment company), than its “nerve center” is the primary place of business, not where the “activity” (i.e. where the property is located) is taking place.
(3) If there are several facilities in several parishes, but only one location where decisions are made, than the latter is the primary place of business.
(4) If there are several facilities in several parishes, each with administrative control of its daily activities, but still a central “nerve center” elsewhere, than the parish with the greatest activity is the primary place of business.
Also, as it relates to the instant case, the federal jurisprudence has clearly established that when reviewing relevant the facts, courts must not impute the principal place of business of a parent corporation to its subsidiary, or impute the principal place of business of a subsidiary to a parent. The only time that this rule does not apply is if the subsidiary is the alter ego of the parent, or vice versa. See, Danjaq, S.A. v. Pathe Communications Corp., 979 F.2d 772, 775 (9th Cir.1992); Pyramid Securities, Ltd. v. IB Resolution, Inc., 924 F.2d 1114, 1120 (D.C.Cir.1991), cert. denied, 502 U.S. 822, 112 S.Ct. 85, 116 *1000 L.Ed.2d 57 (1991); U.S.I. Properties Corp. v. M.D. Construction Co., 860 F.2d 1, 7 (1st Cir.1988); J.A. Olson Co. v. City of Winona, Miss., 818 F.2d 401, 413 (5th Cir.1987); Grimm v. Plasma Processing Corp., 888 F.Supp. 56, 58 (S.D.W.Va.1995). There is nothing in this record to indicate to this Court that J. Ray McDermott, Inc. is the alter-ego of any other |7McDermott International corporation, specifically, McDermott, Inc. The following chart will help with the analysis:
MCDERMOTT INTERNATIONAL Headquarters In New Orleans Owns 100% of McDermott, Inc. Owns 61% of J. Ray McDermott, S.A.
J. RAY MCDERMOTT, S.A. Headquarters in Houston Owns 100% of J. Ray McDermott Holdings, Inc.
MCDERMOTT, INC. Headquarters in New Orleans
J. RAY MCDERMOTT HOLDINGS, INC. Owns 100% of J. Ray McDermott, Inc.
J. RAY MCDERMOTT, INC. Headquarters in Houston Principal Business Establishment in Amelia, Assumption Parish
With this in mind, we turn to the instant case. J. Ray McDermott, Inc.’s corporate purpose is marine construction; its corporate headquarter is in Houston, Texas. It is involved in offshore oil and gas construction. Specifically, it fabricates steel decks and jackets, and installs offshore pipelines. These activities |sare divided into two divisions; the fabrication division is located in Bayou Boeuf and the marine division is located in Bayou Black. The operations in Bayou Boeuf span two parishes: Assumption Parish and St. Mary Parish, however, the vast majority of the work is in Assumption Parish, with only a rolling mill in St. Mary Parish. Bayou Black is in Terre-bone Parish and all barges and vessels are located there. There are offices in Assumption Parish and Terrebone Parish, *1001 which direct the daily activities within those parishes. However, the main administrative office is in Assumption Parish.
The deposition of David A. Bowe was taken to help determine venue. He testified that he is the Director of Human Resources, Western Hemisphere for J. Ray McDermott, Inc. His office is in Amelia, Louisiana, which is in Assumption Parish. He indicated that J. Ray McDermott, Inc. has approximately 2500 employees. He estimates that 1600 are in Assumption Parish, 100 are in St. Mary Parish, 700 are in Terrebone Parish, and 50-60 are in Orleans Parish. The employees in Orleans Parish are predominantly engineers who report directly to McDermott Engineering Houston, not J. Ray McDermott, Inc.;[2] the remaining Orleans Parish employees consist of legal counsel. There is also an equipment and machinery office in Orleans Parish. Mr. Bowe further testified that all hiring and firing is done in the Assumption Parish office; all insurance claims are submitted in the Assumption Parish office; and all environmental safety issues are handled in the Assumption Parish office. The Human Resources office, which is in Assumption Parish, is also in charge of payroll and there are public relations people in both Assumption Parish and Orleans Parish.
laAs mentioned previously, this is a marine construction corporation. The majority of daily activities are labor-intensive; however, the most important managerial functions are also carried on in Assumption Parish. For example, the administration for costs and projects is in Assumption Parish, the procurement of equipment is in both Assumption Parish and Terre-bone Parish, materials for the marine and fabrication divisions are received in Assumption Parish and St. Mary Parish. Most importantly, bidding, contracting, and estimating - the heart of the business - take place in Assumption Parish. The legal group in Orleans Parish is not normally involved in the contracting process. The engineers are not regularly consulted, either.
Mr. Thomas Henzler testified regarding the corporate structure of J. Ray McDer-mott, Inc. He is the Vice-President of Tax Administration for J. Ray McDermott, Inc. and several other McDermott International corporations. He is formally employed by McDermott, Inc. McDermott, Inc. is the corporation that actually rents the 1450 Poydras Street office in New Orleans, which sometimes receives mail for J. Ray McDermott, Inc. The McDermott, Inc. office performs tax and accounting services for all of the McDermott International corporations, not only J. Ray McDermott, Inc. Tax services include filing state and federal returns, defending audits, and preparing tax plans. When asked where a state auditor would have to go to perform an audit on J. Ray McDermott, Inc., he replied Assumption Parish.
Mr. Henzler further testified that ten of the officers of J. Ray McDermott, Inc. have their office at 1450 Poydras Street, in New Orleans; six are in Houston, |inTexas; and three are in Assumption Parish.[3] Two of the directors have their office at 1450 Poydras Street, and the other director is located in Houston. Mr. Henzler was unaware of where the directors’ meetings take place. Officers’ meetings for the four quarterly meetings prior to Mr. Henzler’s deposition were all held in New Orleans. He further stated that these meetings have taken place in Morgan City, Virginia, Ohio, Houston and Canada as well. The purpose of these one-day meetings is for the officers to report what has been taking place in their departments and what direction their departments will take in the future. They do not concern the daily business decisions and activities of J. Ray *1002 McDermott, Inc. which are made primarily at the Assumption Parish office.
Considering the total circumstances outlined above, we find that Assumption Parish is J. Ray McDermott, Inc.’s de facto primary place of business. J. Ray McDermott, Inc. is a labor-intensive corporation with the large majority of its activities taking place in Assumption Parish. The daily control of the corporation is exerted in Assumption Parish and several administrative functions are also performed in Assumption Parish. Moreover, bidding, contracting and estimating, which essentially form the most important managerial functions, also take place in Assumption Parish. The only corporate function that occurs in Orleans Parish is tax and accounting administration, which is actually done by McDermott, Inc. Neither the engineers nor legal counsel located in New Orleans are consulted regularly. Therefore, in this case, the primary place of business of J. Ray |nMcDermott, Inc. is Assumption Parish and that is where venue is proper under La. C.C.P. art. 42(4).[4]
Accordingly, the judgment of the trial court that maintained venue in Orleans Parish is reversed. The exception of improper venue is granted; the case is remanded and transferred to the district court in Assumption Parish.

WRIT GRANTED; REVERSED AND REMANDED.

LANDRIEU, J., CONCURS IN THE RESULT.

. Indeed, the determination of a foreign corporation’s primary place of business is subject to discovery. The determination should be made at a point when adequate discovery has uncovered where the primary place of business is located. See Pinnacle Consultants, Ltd. v. Leucadia National Corp., 923 F.Supp. 439, 450 (S.D.N.Y.1995).

. Since the taking of Mr. Bowe's deposition, the name, McDermott Engineering Houston, may have been changed.

. The exhibits refer to Assumption Parish as Morgan City, but when asked to clarify, Mr. Henzler stated that these officers were in Assumption Parish.

. In light of the views expressed herein and the facts outlined above, we do not find La. C.C.P. art. 77 to be applicable to the instant case.